No. 22090.

Frank E. Goldy, Commissioner of Banking and the Banking Board, State of Colorado *v.* Lewis E. Henry, Thomas A. Waters, William L. Doig, Anton C. Zeman, Jr., and George T. Sweeney, the proposed incorporators of the Wheat Ridge Bank.

(443 P.2d 994)

Decided July 29, 1968.

402

DUKE W. DUNBAR, Attorney General, FRANK E. HICKEY, Deputy, A. FRANK VICK, JR., Assistant, RICHARD L. EASON, Assistant, for plaintiffs in error.

COLLIER, HAYDEN & SWEENEY, for defendants in error.

*En Banc.*

Mr. Justice Pringle delivered the opinion of the Court.

This writ of error is directed to a judgment of the District Court of Jefferson County directing the State Banking Board to grant a bank charter to defendants in error.

Plaintiffs in error, the Commissioner of Banking and the State Banking Board, will hereinafter be referred to as the Board. Defendants in error, the incorporators of the proposed Wheat Ridge Bank and applicants for the charter, will hereinafter be referred to as applicants.

■ C.R.S. 1963, 14-2-7(2), which is applicable to the proceeding here, gives the reviewing court power to reverse or modify an order of the banking board where it is not supported by substantial evidence in the record. The trial court, in reversing the Board, held that certain findings of fact made by the Board were not supported by substantial evidence, giving as its reasons the following:

"All of the witnesses, except one, protesting the granting of the charter were either officers, directors or employees of competitor banks who, naturally, do not want any more competition. The neutral witness of the protesting parties simply defined the Wheat Ridge area.

"The organizers' witnesses were substantial members of the community, and the petition, containing over 2,700 signatures, indicates acceptance by the community."

■ The Board is here contending that the record before it contained sufficient documentary evidence and expert testimony to support its order denying the charter application, and that the trial court improperly substituted its judgment as to the credibility of witnesses for that of the Board. We hold that the Board's order was supported by substantial evidence in the record and we must therefore reverse the trial court.

The record before the trial court consisted of two bound volumes of testimony recorded during two days

of hearings before the Board, plus three volumes of exhibits. The applicants, through expert testimony and the testimony of some of the proposed bank's officers and incorporators, attempted to show that the area known as Wheat Ridge was a large unincorporated community not presently enjoying community banking service, and that the proposed bank would provide more convenient banking service to the residents of the area.

A certified public accountant retained by the applicants submitted a projected income and expense statement showing that the proposed bank could expect to begin operating at a profit sometime during its second year, and testified to the same effect at the hearing. It is not disputed that the applicants made a prima facie case for granting of the charter under the standards set forth in C.R.S. 1963, 14-9-10. This statute places the burden on the applicant at the hearing to show (1) that the proposed bank will serve a "public need and advantage" in the community, and (2) that the volume of business in the community is such that "profitable operation of the bank may be reasonably projected."

Six banks in the area surrounding the proposed bank location appeared before the Board to protest issuance of a charter and presented evidence tending to show that the area which would actually be benefitted by the proposed bank was much smaller and less populous than that contended for by the applicants; that the Wheat Ridge area was being adequately served by existing banking facilities in adjacent areas, and that banking in these areas was already highly competitive. A certified public accountant employed by the protestants submitted a projected income and expense statement indicating that the proposed bank could expect to operate at a loss for the first three years, and testified at the hearing that in his opinion the proposed bank could not be expected to operate at a profit for the first several years.

Based on this sharply conflicting evidence, the Board

found the boundaries of the Wheat Ridge community to be substantially as contended by the protestants, a finding which was amply supported by the record, and which eliminated populous areas along the south and west boundaries of the area as drawn by the applicants. Since the applicants' deposit estimates were based on population figures for the larger area, this finding alone throws considerable doubt on the applicants' projection of income and expenses, which was the foundation of their showing that the proposed bank could expect to operate at a profit. The Board then concluded:

"* * * [T]hat the volume of business attributable to commercial banking in the Wheat Ridge community and within the area proposed to be served by the proposed bank and which might be reasonably anticipated to be generated by said proposed bank is not such that profitable operation of the proposed bank could be reasonably projected * * *."

As regards the statutory requirement that the proposed bank must serve a "public need and advantage," the Board found:

"* * * [T]hat the proposed Wheat Ridge Bank . . . will not serve a public need and advantage within such community . . . as the said community and proposed service area are presently adequately served with banking facilities and financing facilities by existing institutions located in immediate proximity to the Wheat Ridge area. The Board finds that there are four (4) existing commercial banks within a radius of approximately two miles from the location of the proposed Wheatridge Bank, and seven (7) commercial banks within a radius of three miles of the proposed location, all of which commercial banks are presently adequately serving the needs of the people within the Wheat Ridge community for banking service and facilities, and are engaged in strenuous competition with each other for banking business. * * *"

The Board also noted that there were eleven savings and

loan associations and twenty-two finance companies and industrial banks within a three-mile radius of the proposed location at 38th and Wadsworth, and concluded: "* * * The Board finds that the addition of the proposed Wheat Ridge Bank would not serve a public need which is not being presently adequately served by existing institutions and would constitute no advantage to the public within the proposed trade area."

█ All of these findings find ample support in the record before us. The applicants nevertheless contend that certain recent decisions of this Court dictated reversal of the Board's order. They place principal reliance on *Goldy v. Gerber*, 151 Colo. 180, 377 P.2d 111; *Banking Board v. Holyoke Industrial Bank*, 152 Colo. 489, 383 P.2d 318, and *Banking Board v. Turner Industrial Bank*, 165 Colo. 147, 437 P.2d 531.

At the outset, we would point out that none of these cases involved a charter application for a new commercial bank, such as is involved here. Both *Holyoke* and *Turner, supra*, concerned applications by existing industrial banks for conversion to commercial banking operations, and since both of these banks were already operating successfully as industrial banks, no real issue of projected profitable operation was involved. Indeed, in *Turner*, the Board had made a finding that the proposed bank could reasonably anticipate operating at a profit.

*Gerber, supra*, involved a situation where the Banking Board had based its decision to deny the application for a charter partly on a finding that the bank could not operate profitably, although the statute in question at that time contained no requirement of projected profitable operation such as is contained in C.R.S. 1963, 14-9-10. In both *Holyoke* and *Turner*, moreover, the applicants made a far stronger showing of public need than is presented in this record. In *Holyoke*, there was only one commercial bank in the area, other than the applicant. The existing bank was in a noncompetitive position and

was extremely conservative both as to the rates of interest paid and as to its lending policies. In *Turner*, there had been but one new bank charter issued in 55 years, despite considerable growth in the community, and the two existing banks were also somewhat conservative in their methods of operation. It should be evident that the strong, *uncontradicted* factors dictating the granting of another bank charter which were present in *Holyoke* and *Turner* are not present here.

In reversing the Board, the trial court disregarded virtually all of the evidence presented by the protesting banks, on the ground that only one of their witnesses was "neutral," or disinterested. It must be pointed out, however, that most of the applicants' witnesses were as interested in seeing that the charter was granted as the protestants' witnesses were in preventing its issuance. The fact that these witnesses had an interest in the outcome of the hearing may affect the weight to be given their opinions, but it does not require the Board to assume that these witnesses were not telling the truth when they testified as to factual matters. Officers and board members of the protesting banks gave factual testimony concerning the active competition for deposits among existing banks in the area, which had resulted in unusually high advertising costs. One bank had even resorted to door-to-door solicitation of accounts. They testified that competition for loans was also extremely high and that as a result, they had found it necessary to lower their standards for making loans. There also was evidence, including testimony from one of the applicants' own expert witnesses, that there had been a leveling off of economic growth in the Wheat Ridge area in recent years. All of this was competent evidence to which the Commission could apply its expertise in determining whether a new banking facility in the area would serve the "public need and advantage."

But the lower court, on review, excised all of this

evidence from its consideration on the sole ground that it was given by witnesses who had an interest in the proceeding, and having accomplished the excision, the court then proceeded to find that there was no substantial evidence to support the Board's findings.

■■ We have said so many times that it is now axiomatic in the law of this state that the credibility of witnesses as well as the weight of the testimony are peculiarly within the province of the commission to whom a statute entrusts the fact-finding process. When a conflict in the evidence exists, it is not within the power of a reviewing court to substitute its judgment for that of the fact-finding authority as to the weight of the evidence and the credibility of witnesses. *Zuzich v. Leyden Lignite Co.*, 120 Colo. 21, 206 P.2d 833.

As previously noted, the two accountants testifying at the hearing gave almost diametrically opposite testimony on the question of whether profitable operation of the proposed bank could reasonably be projected. Both testified at some length as to the data and methods used in computing their projected income and expense statements. The accountant who testified for the protesting banks was a member of a firm specializing in bank accounting which regularly handled the accounts of some fifty banks. The fact that this firm was employed on a regular basis by four of the six protesting banks did not compel the Board to disregard his testimony or the documentary evidence prepared by him. His interest in the outcome of the hearing was no greater than that of the accountant employed by the applicants, and the Board was equally entitled to accept the testimony and conclusions of either of these expert witnesses.

■ The lower court also apparently attached considerable weight to the petitions circulated by the applicants, signed by some 2,700 persons, which the court found "indicates acceptance by the community." Such petitions may indicate that the proposed bank would

enhance the convenience of banking in Wheat Ridge, but convenience is only one of the factors the Board was entitled to consider in determining whether the proposed bank would serve a "public need and advantage" in the area. The Board evidently considered that other factors, such as the already highly competitive nature of banking in the area surrounding Wheat Ridge, outweighed the convenience factor. It was within the Board's competence, applying its expertise, to make this determination, and it should not be disturbed on review.

The judgment is reversed and the cause remanded with directions to affirm the judgment of the Banking Board in this matter.

MR. JUSTICE DAY and MR. JUSTICE KELLEY not participating.